**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CURTIS S.,**[1] | : | **Civil No. 3:24-CV-01178** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,** | : | |
| **Acting Commissioner of Social Security,**[2] | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I.    Introduction

While Social Security appeals are judged against a deferential substantive standard of review, case law imposes a clear obligation upon Administrative Law Judges (ALJs) to fully articulate their rationale when denying benefits to disability applicants. This duty of articulation is essential to informed judicial review of agency decision-making since, in the absence of a well-articulated rationale for an

---

[1] Due to the nature of his impairments, the plaintiff has requested the Court refer to him in this decision using only his first name and last initial.

[2] Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

ALJ's decision, it is impossible to ascertain whether substantial evidence supported that decision. At a minimum, this duty of articulation requires the ALJ to draw a legal and logical bridge between any factual findings and the final conclusion denying the disability claim.

The instant case illustrates the importance of this logical bridge, providing "a clear and satisfactory explication," Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981), of the basis for the limitations that are revealed by substantial medical evidence. At a minimum this duty of articulation means that the ALJ's decision must be grounded in medical and economic realities. In this case, the ALJ summarized medical records with regard to the plaintiff's irritable bowel syndrome (IBS) which clearly demonstrated that, at baseline, he was using the restroom five to ten times per day and during flare-ups in excess of twenty times per day. These attacks of gastrointestinal urgency were urgent, unexpected and sudden. Yet, despite this clear and unequivocal evidence, demonstrating a pattern of the plaintiff's illness in this regard throughout the disability period, the ALJ included no off-task time in the plaintiff's residual functional capacity (RFC). More importantly, the ALJ did not address the potential off-task time that would inevitably result from such frequent restroom use, only vaguely stating that he had "at least some symptomatic improvement with medication." (Tr. 22).

2

Upon consideration, we find that the ALJ failed to adequately account for the plaintiff's fecal incontinence related to his IBS and provided no explanation for the omission of such off-task limitations in the RFC. Thus, in the instant case we conclude that the ALJ's burden of articulation has not been. Accordingly, we will remand this case for further consideration and evaluation by the Commissioner.

## II.    Statement of Facts and of the Case

### A. Introduction

The plaintiff, Curtis S., filed a Title II application for disability and disability insurance benefits with the Social Security Administration on August 27, 2021. (Tr. 76). In this application the plaintiff indicated that he was disabled due to the combined effects of Small Fiber Polyneuropathy, irritable bowel syndrome – diarrhea (IBS-D), and chronic fatigue syndrome. (Id.) The plaintiff was born in May of 1976 and was in his forties by the time of these disability proceedings, considered a younger individual under the Social Security regulations. (Id.) He had a college education along with specialized medical training and had owned his own chiropractic practice before he alleged he needed to stop working due to his impairments. (Tr. 52-53).

## B. <u>The Medical Evidence of The Plaintiff's Irritable Bowel Syndrome</u>

Although the plaintiff also alleged difficulty performing his work as a chiropractor due to neuropathy in his hands and fatigue, the primary issue on appeal is the ALJ's treatment of his IBS symptoms. With regard to this impairment, the medical records can be summarized as follows: In January 2017 the plaintiff underwent treatment for GERD and pursued Nissen fundoplication surgery, complications from which eventually resulted in persistent diarrhea. (Tr. 294). He sought treatment from Hershey Medical Center gastroenterology in September 2017. Treatment notes from September 6, 2017, state he had previously sought treatment at a local gastroenterologist and was negative for C. diff infection and a September 2016 colonoscopy was unrevealing without any concern for microscopic colitis. (Id.) At his September 2017 appointment, he reported ten to twelve watery bowel movements per day, occurring within thirty minutes of eating, and having to wake up multiple times in the middle of the night because of the urge to use the bathroom. (Id.) He denied abdominal pain but reported twenty-five to thirty pounds of weight loss within this period. (Id.) Provider notes state he had recently quit his profession due to his symptoms. (Tr. 295). He was started on rifaximin,[3] and it was

---

[3] A brand name for rifaximin is Xifaxan, the medication referenced by the plaintiff's primary care physician.

4

recommended to increase Imodium to two to three times per day, noting it had been effective for him. (Tr. 296).

Further testing was recommended by his GI specialist. A September 2017 lactose breath test revealed no evidence of lactose intolerance or malabsorption (Tr. 298-99). An October 2017 colonoscopy revealed normal findings with no evidence of inflammation, but a polyp was removed. (Tr. 307). An endoscopy revealed fluid in the stomach, concerning for possible gastroparesis, and a follow-up stomach emptying test was recommended. (Tr. 307). His bloodwork, biopsies, and stool cultures were all completely normal. (Tr. 309). At a December 2017 follow-up, the plaintiff reported an improvement in his diarrhea for six weeks following the colonoscopy, reduced to two or three bowel movements per day, but stated he experienced a recurrence of his diarrhea in the week prior to the appointment and noted it was so debilitating that he had to retire and was unable to continue his work. (Id.) He reported still taking two or three Imodium per day. (Id.) He was diagnosed with irritable bowel syndrome with predominant diarrhea (IBS-D) and amitriptyline was started. (Tr. 310).

The plaintiff visited his GI specialists again on March 6, 2018. His doctors noted the gastric emptying test was positive for gastroparesis, but he had been asymptomatic in that regard and denied any nausea, vomiting, or abdominal

bloating. (Tr. 313). They noted that the extensive diagnostic workup had been "reassuring" and attributed his symptoms to irritable bowel syndrome with diarrhea. (Tr. 314). He was prescribed rifaximin again, told to use Imodium as needed, and scheduled for a six-month follow-up, noting that "the priority is management of his IBSD with a goal of improving his quality of life." (Id.)

At a GI follow-up in June 2018, it was noted that he had an "excellent" response to rifaximin and was down to three to four bowel movements daily, only needing Imodium as needed once in the past two months. (Tr. 316). He noted minimal nausea with regard to his gastroparesis and was advised to continue low volume meal management. (Tr. 317). His doctor noted that the plaintiff seemed satisfied with the status of his bowel habit management at a December 2018 follow-up since he was responding well to the rifaximin, however he expressed concerns about the significant copay and discussed weaning him off gradually and considering Imodium for management of his symptoms. (Tr. 321-22).

Although his appointments with gastroenterology specialists were relatively infrequent, he continued to see his primary care physician, Dr. Shafi, and reported ongoing GI symptoms from his IBS, which provide a more detailed picture of the extent and severity of his condition. For example, in December 2018 and April 2019, Dr. Shafi stated that the plaintiff has a "typical cycle" with frequent evacuation with

6

"severe symptoms" every ten to fourteen days, and otherwise an unchanged baseline of eight to ten bowel movements per day, which had remained unchanged despite him being on Xifaxin. (Tr. 764, 766). They again discussed trying to wean him off Xifaxin. (Tr. 766). Again, in August 2019 the plaintiff reported to Dr. Shafi continued frequent evacuation with severe symptoms two to three times per month and that he was currently in a "flare." (Tr. 762). He stated that he had weaned down to two Xifaxan per day before the episode. (Id.)

The plaintiff had another follow-up with gastroenterology in December 2019, and he reported having five bowel movements per day and up to ten on a "bad" day with flare-ups occurring about every two to three weeks lasting only about one to two days instead of three to four days previously. (Tr. 330). He stated that he had tapered rifaximin down to two pills per day and denied vomiting and abdominal pain. (Id.) A January 2019 colonoscopy showed hemorrhoids and diverticulosis. (Id.) The plaintiff reported that he was able to eat small, frequent meals but continued to have nausea every time he ate. (Tr. 331) In February 2020 he reported to Dr. Shafi that his symptoms had become more frequent due to the stress he was under, but that they were shorter in duration, typically only one day. (Tr. 757). In June 2020 he reported to his GI specialists that he was still trying to wean off Xifaxam and was at two pills per day as well as two herbal remedy pills (Intesol) which were helping

7

him decrease bowel movements to five to six per day. (Tr. 801). He noted that, when he had recently run out of his prescription, he began to have ten to fifteen liquid bowel movements per day. (Id.)

In December 2020, he reported to Dr. Shafi that he was off Xifaxam routinely and was only taking it cyclically now, (Tr. 750), but reported to his GI specialists that he had a significant flare up after being off the medication for two months. (Tr. 341). At the end of June 2021, he reported to Dr. Shafi that he had a ten-week flare of his IBS that "really took a long time moving along" and had to do two courses of Xifaxam, the second of which for fourteen days which, "finally controlled the bathroom frequency" but the cramping continued "to some degree for ten weeks." (Tr. 746). He noted that his symptoms had finally "gone back to [his] normal" and Dr. Shafi noted that an EMG showed "no further progression" of the disease and "they are in a holding pattern." (Id.)

By October 2021, he reported to Dr. Shafi that he had taken another course of Xifaxan but said his symptoms lasted for five weeks instead of ten weeks. (Tr. 985). He reported another flare-up to his GI specialists that occurred in November 2021 with diarrhea up to ten to twelve times per day. (Tr. 838). At his December 2021 appointment he stated that he took rifaximin for two weeks and his BM frequency was improving – now at eight to twelve times per day. (Id.) He also reported

persistent nausea. (Id.) In February 2022 he reported to Dr. Shafi that his GI specialists had not made any changes in his routine prescribed medications because he continues to have "regular flares" needing Xifaxan "regularly." (Tr. 986-87). He stated that his symptoms were "definitely no better" but they hoped to be able to do a better job of controlling them with medication changes. (Id.) He again reported to Dr. Shafi in May 2022 that he cycles through some "miserable" times but that they were "short-lived considering." (Tr. 1044). At the end of 2022, his GI specialists noted that his treatment with rifaximin had become cost prohibitive and he started on Cymbalta. (Tr. 1084). The plaintiff reported continuing his baseline with five or more bowel movements per day and exacerbations reaching twenty-five bowel movements per day, "so [he] felt like change in his regimen was needed." (Tr. 1084). His doctors noted that he lost seven pounds with his flare-up the week prior which resulted in diarrhea twenty-five times per day and vomiting. (Tr. 1081).

In sum, the longitudinal medical evidence showed that the plaintiff's IBS symptoms waxed and waned, and were improved with rifaximin, but that at his baseline he was having five to ten bowel movements per day and he continued to have monthly flare-ups lasting days in duration with up to twenty-five bowel movements per day and would occasionally have weeks long flare-ups, which could last for up to ten weeks in duration. Moreover, it appears his symptoms were often

unpredictable in nature, and that his attempts to wean off of rifaximin, which had become cost prohibitive to him, often resulted in increased flare-ups and exacerbation of symptoms.

### C. **The Plaintiff's Statements Regarding His IBS Symptoms**

It was against this clinical backdrop that an ALJ conducted a hearing regarding the plaintiff's disability application on June 14, 2023. (Tr. 48-74). The plaintiff and a vocational expert both appeared and testified at this hearing. (Id.) At the hearing, the plaintiff testified that he stopped working as a chiropractor in August 2017 due to neuropathy in his hands and because he was experiencing IBS-D "in its most acute state," having to use the bathroom very frequently throughout the day and making him unable to maintain appointments. (Tr. 53). With regard to his IBS symptoms, he stated that, at the beginning he was going to the bathroom more than twenty-eight to thirty times per day, lasting thirty minutes in duration, with "explosive evacuation" and severe cramping. (Tr. 58-60). He stated that, after about eighteen months, the medication rifaximin did start to become effective and he was able to get down to twelve to fifteen bowel movements per day with decreased cramping. (Id.) He described trying to wean off the rifaximin, but each time he stopped the medicine, within two weeks being back at twenty bowel movements per day. (Id.) He stated that in 2022 he switched to another medication that was effective

10

in reducing his bowel movements to five to seven per day but that it caused regular vomiting and nausea, so he switched back to rifaximin and, at the time of the hearing, was regularly having seven to nine bowel movements per day. (Id.)

With regard to the predictability of his symptoms, the plaintiff testified that about half the time he will have nausea and cramping about ten to fifteen minutes before the onset of his symptoms but that there are times when he has no warning. (Tr. 60). He described having two flare-ups in the prior six-month period, lasting a total of three months, stating, "so out of a six-month period, almost three months' worth of flare-ups dealing where I'm not doing much of anything but sitting, sleeping, and using the bathroom." (Tr. 65). He explained having to cancel doctor's appointments, miss his children's sports games, recitals, family reunions, and vacations due to being unable to leave the house and has had to adjust his routine daily depending on how his symptoms are each morning. (Tr. 61).

A vocational expert (VE) also testified at the hearing. The VE testified that on average, an employer can tolerate employee absences of no more than one-half a day to one day per month not to exceed eight to ten days in a year. (Tr. 71). The VE also testified that a typical employer gives one fifteen-minute morning and afternoon break and a thirty-minute scheduled lunch hour and that a typical employer has a tolerance for an employee being off-task up to fifteen percent of the workday. (Tr.

11

71). The VE testified that no jobs existed where employer tolerances for absences or being off-task exceeded this amount. (Id.)

### D. **ALJ Hearing and Decision**

Following this hearing, the ALJ issued a decision denying the plaintiff's disability application on July 25, 2023. In that decision, the ALJ first concluded that the plaintiff last met the insured status requirements of the Social Security Act on December 31, 2022, and had not engaged in substantial gainful activity since his August 31, 2017, application date. (Tr. 12). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that the plaintiff suffered from the following severe impairments: small fiber polyneuropathy, IBS and gastroparesis, chronic fatigue syndrome, degenerative joint disease, asthma, DeCrum's disease, and right sided hearing loss. (Id.)  At Step 3 the ALJ determined that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 13-14).

The ALJ then fashioned the following RFC for the plaintiff:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional postural movements except frequent balancing, occasional hearing right ear, and avoid concentrated exposure to temperature extremes, humidity, loud noise, vibration, fumes, odors, dust, gases, and poor ventilation.

12

(Tr. 14).

Notably, this RFC accounted for no accommodations for the plaintiff's frequent and unpredictable bowel movements, which are consistently and unequivocally reflected in the record, despite acknowledging the plaintiff's IBS as a severe impairment and summarizing the longitudinal medical evidence showing he was frequently having ten to twelve bowel movements per day, with flare-ups resulting in up to thirty bowel movements per day. In omitting any accommodations for the plaintiff's frequent restroom trips, the ALJ found that, although the plaintiff's medically determinable impairments, including his severe IBS, could reasonably be expected to cause the symptoms he alleged, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence. (Tr. 14-15). The ALJ went on the summarize the above-described GI specialist records showing severe IBS symptoms that were somewhat improved with medication, but consistently showed a baseline of up to ten bowel movements per day with frequent flare-ups. The ALJ's summary of the medical evidence also conspicuously did not reference any of the primary care records with regard to his IBS symptoms, which provide much-needed context with regard to the frequency of flare-ups and the plaintiff's ongoing symptoms, since he was only following up with his specialists every six months. Moreover, the ALJ

frequently focused on the fact that the plaintiff's weight was stable, but mischaracterized evidence in this regard; for example, stating that his specialists reported his weight as stable at a December 2022 appointment, yet the record demonstrates that the doctors, in fact, noted he had lost seven pounds the prior week after a flare-up of up to twenty-five bowel movements per day and vomiting. (Tr. 1081).

The ALJ then summarized the records as follows:

The undersigned finds that the claimant's allegations regarding the limiting effects of his alleged conditions are not supported by the record. The combination of the claimant's severe impairments limits his ability to perform work within the light exertional level with additional non-exertional limitations. However, the objective findings of record show that his extensive work-ups and evaluations with neurology, GI-specialists, rheumatology, and dermatology have remained overall stable, as well as his physical examination findings. The record indicates that the claimant's small fiber neuropathy remained untreated as he declined medications for symptomatic treatment, such as Pamelor (Exhibits 4F and 5F). The claimant testified to ongoing GI related symptoms and flares with increased episodes of diarrhea. The record shows that the claimant's GI-related work-up was extensive and overall unrevealing. The claimant had at least some symptomatic improvement with medication, specifically rifaximin to the extent that he was reportedly "quite satisfied" with his response and improvement to 3-4 bowel movements per day. However, the record indicates that that medication proved to be cost prohibitive and was only started on a trial of Cymbalta and later Viberzi at the time of the date last insured (Exhibits 2F, 5F, and 17F).

(Tr. 22). This summary notably did not reconcile the previously referenced medical records showing an ongoing frequent need to use the restroom with the decision not to include any off-task time in the RFC.

This appeal followed. (Doc. 1). On appeal, the plaintiff's sole argument is that the ALJ failed to account for the total limiting effects of his symptoms in failing to address the off-task time resulting from his frequent severe IBS symptoms. Upon consideration, we find that the ALJ's failure to address or account for the unequivocal, consistent medical evidence of frequent, unpredictable, and uncontrollable bowel movements in the RFC was error. Therefore, we will remand this case for further consideration and evaluation of the evidence.

## III.    Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial

evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777

F.3d 607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

**B.**    **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018

WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating

the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show

that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and

RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that

determination entails an assessment of what work the claimant can do given the

physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have

followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and state that "[r]arely can a decision be

made regarding a claimant's residual functional capacity without an assessment from

a physician regarding the functional abilities of the claimant." <u>Biller</u>, 962 F.Supp.2d

at 778–79 (quoting <u>Gormont v. Astrue</u>, Civ. No. 11–2145, 2013 WL 791455 at *7

(M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here,  where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony

22

regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

It is against these legal benchmarks that we assess the instant appeal.

### C.    <u>This Case Should Be Remanded.</u>

In our view, more is needed here on behalf of the ALJ to account for the plaintiff's clear and indisputable need to use the restroom frequently, at baseline in excess of five to ten times per day and during flare-ups in excess of twenty times per day. Indeed, the ALJ's complete omission of any discussion regarding off-task time or absenteeism related to the plaintiff's frequent restroom needs deprives the Court of the ability to conduct meaningful review, since we are without answers as to the ALJ's reasoning for not including any off-task time in the RFC assessment despite this undisputed evidence.

As the plaintiff points out, despite the ALJ concluding that the plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were inconsistent with the record, the ALJ's own summary of the medical evidence clearly demonstrates some need to address off-task time and absenteeism. Indeed, the ALJ noted an onset of acute symptoms in September 2017, with ten to twelve bowel movements per day, periods of relative improvement with medication, down to three to four per day in June 2018, but an increase in symptom severity when

weaning off the medication, and frequent flare-ups, noting in December 2019 up to ten bowel movements on a "bad" day with flare-ups occurring every two to three weeks for one to two days, significant flare-ups in June 2021 after being off his medication, and a flare-up of diarrhea up to ten to twelve times per day in December 2021, which had improved with rifaximin down to eight to twelve times per day. (Tr. 14-18). Upon these records alone, as acknowledged by the ALJ, it is clear that some level of accommodation would need to be made for the plaintiff's frequent need to use the restroom on a consistent basis. Moreover, the ALJ's analysis omitted the plaintiff's primary care physician's ongoing treatment of his IBS, which added context to the extent and frequency of his IBS symptoms and demonstrated that his condition was ongoing and not well controlled, and the ALJ mischaracterized the evidence with regard to the plaintiff's weight, maintaining that it was consistently stable despite evidence to the contrary.

On this record, the ALJ simply has not created a logical bridge between the evidence summarized in the decision and the limitations in the RFC which are completely devoid of any accommodation for these severe symptoms. This was error. We are not alone in this regard. Our view is supported by many other courts who have found that remand is necessary when an ALJ fails to include appropriate restrictions in a claimant's RFC where the evidence demonstrates a need for frequent

restroom breaks. See Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377, 389 (4th Cir. 2021) ("Obviously, the need to visit the bathroom many times throughout the day impacts one's ability to work. And yet, the ALJ did not analyze Appellant's need for regular bathroom breaks"); Laura J v. O'Malley, No. 7:22-CV-00402, 2024 WL 1954157, at *5 (W.D. Va. Feb. 14, 2024) (remanding where the ALJ failed to engage in "a robust and thorough discussion" of how he arrived at an RFC that allowed for only 5% off-task time to account for the plaintiff's chronic diarrhea); Robinson v. Saul, No. CV22001659MBSMGB, 2021 WL 3410544, at *5 (D.S.C. June 11, 2021), report and recommendation adopted, No. 2:20-CV-01659-MBS, 2021 WL 2947732 (D.S.C. July 14, 2021) (finding the court could not perform a meaningful review of the issue where an ALJ did not explain why no off-task time was included for incontinence); Hardin v. Saul, No. CV 19-953, 2020 WL 5593745, at *4 (W.D. Pa. Sept. 18, 2020) (more explanation needed where ALJ included no restrictions in RFC regarding the number and duration of restroom breaks plaintiff may need); Peterson v. Berryhill, 363 F. Supp. 3d 651, 661–62 (D.S.C. 2019) (remanding where the ALJ failed to account for the plaintiff's claims of bathroom usage ten times a day for fifteen to thirty minutes each, despite evidence supporting the plaintiff's claim).

Moreover, this error is not harmless where the vocational expert testified that no jobs existed that could accommodate an employee being off-task more than fifteen percent of the workday and absent more than one-half a day to one day per month not to exceed eight to ten days in a year. (Tr. 71). Finally, we are not persuaded by the Commissioner's post-hoc rationalization for the ALJ's unexplained omission of off-task time, arguing that the plaintiff's testimony that he needed to use the restroom seven to nine times on a normal day did not support the need for any additional breaks. The Commissioner's reliance on a single out-of-circuit district court decision which would divide the number of restroom trips into evenly spaced intervals throughout the day which would then not exceed the total allowable breaks completely misrepresents and misunderstands the very nature of the plaintiff's irritable bowel syndrome. Indeed, what makes IBS impairing in nature is the sudden, uncontrollable, and unpredictable urgency of bowel movements which are often brought on by stress, including the stress of a workday. For example, the plaintiff testified that his symptoms were predictable only about fifty percent of the time and, even then, only ten to fifteen minutes prior the onset of symptoms. Thus, engaging in this sort of mathematical averaging that would require the plaintiff's symptoms to be quite predictable and regularly schedule is a flawed rationale that does not reflect the medical realities of the disease. See e.g. John C. v. Kijakazi, No.

23-CV-6145DGL, 2023 WL 8644129, at *3 (W.D.N.Y. Dec. 14, 2023) (remanding where the ALJ's finding that plaintiff's regular bowel movements and/or episodes of incontinence could be accommodated by one additional break in the morning and one additional break in the afternoon, was not supported by any specific testimony or medical opinion).

Simply put, more is needed here. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). This means that there must be a logical nexus between the ALJ's factual findings and legal conclusion. That logical bridge is missing here. On the current record, it seems that the ALJ considered, and credited, medical evidence showing the plaintiff would, at baseline, need to use the restroom five to ten times per day, and would experience monthly flare-ups requiring him to use the restroom in excess of twenty times per day, but, without explanation, arrived at an RFC which included no off-task time for such frequently required breaks.

Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment

of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.  **Conclusion**

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: April  10, 2025